Entered: June 21st, 2021
Signed: June 21st, 2021



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Terry Lucille Randall, | * | Case No. 19-21815-MMH |
| | * | |
| Debtor. | * | Chapter 7 |
| | * | |
| * * * * * * | * | * * * * * * |
| | * | |
| Terry Lucille Randall, | * | |
| | * | |
| Plaintiff, | * | Adversary No. 19-00368-MMH |
| v. | * | |
| | * | |
| Navient Solutions, | * | |
| | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * * |

## MEMORANDUM OPINION

A bankruptcy case generally offers the honest but unfortunate debtor a financial fresh start. This objective is implemented through the bankruptcy discharge, which allows most debtors to eliminate most of their prepetition debts upon completing their bankruptcy cases. Although the Bankruptcy Code[1] reflects Congressional intent to provide debtors with as broad of a discharge as possible, Congress has expressly excepted certain kinds of debt from the bankruptcy discharge. One of the most significant categories of debt excepted from discharge, and at issue in this adversary proceeding, is student loan debt.

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code").

The debtor in this proceeding owes over $500,000 in general unsecured student loan debt, with approximately $190,000 of that being owed to the defendant. The debtor is 68 years old, does not own any meaningful assets, and is not incurring any unnecessary or excessive expenses. Despite holding various degrees, the debtor has been working for the past several years at a job paying approximately $13 per hour, with some opportunity for overtime. The debtor testified that she has tried to repay her student loan debt but that the money just is not there. According to the debtor, after paying necessary living expenses, she has nothing left to give. The defendant disputes this conclusion, arguing that the debtor is able to continue working and to pay something back on the student loans. The parties' dispute raises a difficult question for the Court, namely how destitute must an individual be to warrant the discharge of her student loan debt?

The Court has considered the evidence presented by the parties, the language of the Code, and applicable case law. The Code permits discharge of student loan debt only if requiring the debtor to repay the debt would impose an undue hardship on her. The Court recognizes that a mere hardship is not enough; it must be an undue hardship. In this case, the debtor is able and is willing to work. Her employment opportunities are, however, limited, and the likelihood of her earning capacity increasing is remote. Although she earns a steady income, her net wages, even with overtime, are not sufficient to support her basic and necessary living expenses and to repay her student loan debt in full. The Code does not require a debtor to be left wearing nothing but the proverbial barrel in order to repay her student loans.

The Court finds that requiring this debtor to further eliminate expenses or commit to working excessive overtime hours at age 68 for any extended period of time is unreasonable and would impose an undue hardship on the debtor. That said, the debtor does have some ability to repay at least a portion of the student loan debt. Accordingly, the Court will not discharge the debt

in its entirety. Such a partial discharge in the face of undue hardship is permissible and, in this Court's view, aligns with the objectives of both sections 727(a) and 523(a)(8) of the Code.

## I.    **Relevant Background**

Terry Lucille Randall, the above-captioned plaintiff and the debtor in the underlying chapter 7 case (the "Plaintiff"), filed her bankruptcy petition on September 4, 2019. The Plaintiff complied with her obligations under the Code and received a standard discharge on December 11, 2019. The Plaintiff also commenced three adversary proceedings relating to her prepetition student loan debt, including this proceeding against Navient Solutions (the "Defendant"). The Defendant filed an Answer to the Plaintiff's Complaint,[2] and the Court conducted an evidentiary trial in this proceeding on April 15, 2021 (the "Trial"). This Court has reviewed all of the admissible evidence, arguments of counsel, and applicable law, and this dispute is now ripe for resolution.

---

[2] The Court notes that, in its Answer, the Defendant raised an affirmative defense of "untimely and ineffective service of process." ECF 6. This affirmative defense appears grounded in Civil Rule 12(b)(5), made applicable to this proceeding by Bankruptcy Rule 7012, and concerns whether the party had actual notice of litigation. That affirmative defense is to be distinguished from a lack of personal jurisdiction, which is grounded in Civil Rule 12(b)(2) and was not raised by the Defendant. *See, e.g., Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704–05 (1982) (explaining potential waiver of personal jurisdiction defense); *Blessing v. Chandrasekhar*, 988 F.3d 889, 894–95 (6th Cir. 2021) (same); *Peay v. Barnett*, 181 A.3d 931, 943–44 (Md. 2018) (explaining difference between service of process and personal jurisdiction defenses). The Defendant did not raise its affirmative defense concerning service of process during the Trial. The Defendant also participated in discovery and actively litigated the merits of this proceeding. ECF 9, 14, 20. *See, e.g., Peay*, 181 A.3d at 944, note 16 ("While the Supreme Court in *Ins. Corp. of Ireland* grounded personal jurisdiction in the Due Process Clause, *see* 456 U.S. at 702–03, 102 S.Ct. 2099, the constitutional dimension to defects in service of process appears to disappear when the defendant has actual notice of the proceeding. *See* 5C Wright, Miller, Kane, Marcus, Spencer & Steinman, Fed. Prac. & Proc. Civ. § 1391 (3d ed. 2017)."). The Defendant had actual notice of this proceeding in a manner that allowed it to actively defend the claims on the merits, and the Plaintiff relied on that participation. The Defendant suffered no harm, and alleged no harm, from the apparent ineffective service of process. *Armco, Inc. v. Penrod-Stauffer Bldg. Systems, Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984) (recognizing that courts may construe rules liberally when a party has actual notice of a proceeding but qualifying that statement when the deficiency creates confusion or potentially prejudices a party's rights). The Court thus finds, based on the entirety of the record, that the Defendant either waived, or is estopped from continuing to pursue, its service of process affirmative defense and that the Defendant had adequate notice and opportunity to be heard in this proceeding. *See, e.g., Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); 5C Wright, Miller, Kane, Marcus, Spencer & Steinman, Fed. Prac. & Proc. Civ. § 1391 (3d ed. 2017); *cf. Blessing v. Chandrasekhar*, 988 F.3d 889, 894–95 (6th Cir. 2021) ("Only those submissions, appearances and filings that give '[the plaintiff] a reasonable expectation that [the defendant] will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking,' result in waiver of a personal jurisdiction defense.") (some citations and quotations omitted).

II.     **Jurisdiction and Legal Standards**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Under 28 U.S.C. § 157(a) and its Local Rule 402, the United States District Court for the District of Maryland has referred this case to the Court. This matter is a statutorily core proceeding under 28 U.S.C. §§ 157(b)(1) and (b)(2). The Court has constitutional authority to enter final orders in this matter. This Memorandum Opinion and the related Order constitute the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The primary issue in this adversary proceeding is whether the Plaintiff may discharge her student loan debt under section 523(a)(8) of the Code. The bankruptcy discharge is a hallmark of U.S. bankruptcy law. It provides a debtor with that coveted fresh start, and it is one of the primary policy objectives underlying the Code. *See, e.g., Grogan v. Garner*, 498 U.S. 279, 286 (1991). Indeed, the Code broadly defines the terms "debt" and "claim" so that, "[g]enerally, 'all legal obligations of the debtor, no matter how remote or contingent,' are potentially dischargeable in bankruptcy." *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008) (citations omitted); 11 U.S.C. §§ 101(5), (12).

The bankruptcy discharge is not, however, absolute. It is limited by, among others, sections 727(a) and 523(a) of the Code. 11 U.S.C. §§ 727(a), 523(a). The only exception to discharge implicated by this proceeding is that found in section 523(a)(8), which provides,

> **(a)** A discharge under section 727 … of this title does not discharge an individual debtor from any debt--
> …
> **(8)** unless excepting such debt from discharge under this paragraph would impose an *undue hardship* on the debtor and the debtor's dependents, for- -
> **(A)(i)** an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

4

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual ….

11 U.S.C. § 523(a)(8) (emphasis added). The Plaintiff argues that the facts and circumstances of her case satisfy the undue hardship requirement of section 523(a)(8); the Defendant disagrees with that position. The Court addresses the relevant facts and the parties' respective arguments below.

## III.     Findings of Fact[3]

The Plaintiff is 68 years old. Tr. 4–5, 14.[4] She received her first college degree, a bachelor's degree in psychology, in 2004 from Morgan State University. Tr. 15; Def. Ex 6, p. 15. She then received a master's degree in human services and public policy in 2008 from Sojourner-Douglass College. Tr. 15; Def. Ex 6, p. 15. The Plaintiff further pursued, but did not complete, a master's degree in business administration from Strayer University. Tr. 16. The Plaintiff financed her education with assistance from her parents and with loans from, among others, the Defendant. Tr. [Adv. 370] 26–27.

The Plaintiff was prepared for, and professional throughout, her testimony and the presentation of her case. The Court observed her demeanor and listened closely to her statements and her responses to the Defendant's questions. The Court found the Plaintiff's testimony credible and generally consistent with the documentary evidence in this proceeding. To the extent that the Plaintiff's testimony differed in any respect regarding precise dates or the exact amount of her

---

[3] At the Trial, the parties and the Court decided to incorporate the Plaintiff's testimony offered in Adv. Pro. No. 19-00370 on April 15, 2021, into the record of this proceeding. The transcript from that proceeding is referred to herein as "Tr. [Adv. 370]". The Defendant also cross-examined the Plaintiff based on, among other things, that testimony. With respect to exhibits, after providing an opportunity for objection, the Court admitted all exhibits offered by the parties, subject to a relevancy objection raised by the Defendant with respect to some of the Plaintiff's documentary evidence. As the Court explained at the Trial, it has considered the Defendant's relevancy objection and, to the extent the Court relies on the Plaintiff's evidence in this ruling, the Court has determined the Defendant's relevancy objection not warranted as to that evidence under Federal Rule of Evidence 401 and overrules it accordingly.

[4] The transcript of the April 15, 2021, Trial in this adversary proceeding is at ECF 22. References to this transcript are noted herein as "Tr." and identify the relevant page number(s) in that transcript.

income and expenses, the Court relies on the documentary evidence. The Court notes that any such discrepancies were minor (for example, the exact start date of her current employment), not intentional, and not material to the Court's ruling herein.

The Plaintiff testified that she is currently employed as a community medical technician, earning approximately $13 per hour with some opportunity for overtime. Tr. [Adv. 370] 26–28; Tr. 18. The Plaintiff appears to have been employed in this or similar positions since 2009, and her hourly wage has ranged between $9 to $13 per hour. Tr. [Adv. 370] 26–28; Tr. 18; Def. Ex. 6, p. 16. The Plaintiff has some ability to supplement her regular wages with overtime. The Plaintiff explained that she has worked an exceptional number of overtime hours during the past year primarily due to the global COVID-19 pandemic and a shortage of workers. The Plaintiff stated that she did not believe her current level of overtime pay would continue after the pandemic recovery. Tr. [Adv. 370] 32–33; Tr. 19.

A review of the Plaintiff's paystubs shows that the Plaintiff has consistently worked overtime hours since at least 2017 and that the total number of those hours fluctuates by pay period. Pl. Ex. 3 [Pay Stubs].[5] The pay stubs suggest that the Plaintiff's overtime hours vary from 40 hours per pay period to over 100 hours per pay period. *Id*. The Plaintiff's pay stubs for 2019, which reflect her most recent pay history prior to the pandemic, show overtime generally between 40 to 80 hours per pay period. *Id*. The Plaintiff's Form W2 for 2019, in turn, lists her annual wages as $43,209. *Id*. at p. 21.

The Plaintiff's monthly expenses total approximately $3,200.[6] These expenses include her monthly rent, car payment, car insurance, health insurance, utilities, and $300 for food and

---

[5] The Plaintiff's exhibits are filed at ECF 21. The Court includes the exhibit number (without counting the Main Document) and the title of the exhibit for ease of reference.
[6] The Plaintiff's Schedule J shows expenses totaling $3,069.88, with the Plaintiff identifying a few additional expenses in her Interrogatory responses. Sch. J, Case No. 19-21815-MMH, ECF 1; Def. Ex. 6, p. 21.

housekeeping supplies. Sch. J, Case No. 19-21815-MMH, ECF 1; Def. Ex. 6, p. 21. Based on the Plaintiff's testimony, although her income may vary depending on her overtime hours, it never varies enough to generate a surplus (or disposable income) at the end of the month. Tr. [Adv. 370] 27, 35. The Plaintiff further testified that, upon retirement, her income will be reduced to $1,500 per month. Tr. [Adv. 370] 31.

The Plaintiff did not deny receiving student loans to finance her education, including student loans from the Defendant in an amount now due and owing of $190,800.35. Def. Ex. 2. Def. Ex. 6, p. 21. The Plaintiff further acknowledged that, with respect to the amounts due to the Defendant, she has only been able to repay approximately $3,764.43. The Plaintiff lists approximately $516,918.04 of total student loan debt in her bankruptcy schedules. Sch. E/F, Case No. 19-21815-MMH, ECF 1.[7]

The main point of contention between the parties concerns whether, under these facts and circumstances, the Plaintiff has an ability to repay her student loan debt without undue hardship. The Court evaluates this issue below under applicable law, incorporating the foregoing findings of fact and making such additional findings as necessary or appropriate in the context of the Court's conclusions of law.

### IV.   Analysis and Conclusions of Law

Many individuals are burdened by student loan debt. In fact, recent statistics suggest that the aggregate amount of U.S. student loan debt exceeds $1.7 trillion.[8] Prior to the pandemic,

---

[7] It is not clear to the Court whether the student loan debt listed in the Debtor's Schedules includes any overlapping or duplicative obligations. The Court does not, however, find that issue relevant to this ruling, as the Court is focused solely on the Debtor's ability to repay her student loan debt to the Defendant.

[8] Jessica Dickler, *Student Debt Rises as the Future of Loan Forgiveness Remains Uncertain*, CNBC, May 28, 2021, https://www.cnbc.com/2021/05/28/student-debt-rises-as-the-status-of-loan-forgiveness-remains-unclear.html.

approximately 20% of federal student loans were in default.[9] The Plaintiff thus is not alone in struggling to repay her student loan debt.

In general, a debtor cannot discharge her student loan debt under the Code. It is one of the few kinds of debt that Congress has deemed automatically not dischargeable in a bankruptcy case. 11 U.S.C. § 523(a)(8). As a result, if a debtor takes no action during her bankruptcy case, her student loan debt flows through the case and remains enforceable against her. A debtor may, however, commence an adversary proceeding to challenge the nondischargeability of the debt. The Plaintiff commenced this proceeding for that exact purpose.

Under section 523(a)(8) of the Code, a debtor's student loan debt is not discharged "unless excepting such debt from discharge ... would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8)(A)(i). The debtor, here the Plaintiff, bears the burden of proof on all elements of this undue hardship test. *See Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005). Courts stringently enforce the student loan debt exception to discharge and have set a high bar for debtors trying to discharge their student loan debt.

The Code does not define "undue hardship." Most courts interpreting section 523(a)(8), including the Fourth Circuit, have adopted the test developed by the Second Circuit for this purpose; a test commonly referred to as the *Brunner* test. *See Brunner v. N.Y. Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987); *see also Frushour*, 433 F.3d at 400; *In re Nightingale*, 529 B.R. 641, 647–48 (Bankr. M.D.N.C. 2015). Under the *Brunner* test, debtors must show:

> (1) they cannot maintain, based on current income and expenses, a "minimal" standard of living for themselves and their dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and

---

[9] *Student Loan Default Has Serious Financial Consequences*, PEW RESEARCH CENTER, WASHINGTON, D.C., Apr. 7, 2020, https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2020/04/student-loan-default-has-serious-financial-consequences.

(3) they have made good faith efforts to repay the loans.

*In re Dunlap*, No. 15-30795, 2016 WL 93805, at *2 (Bankr. W.D.N.C. Jan. 6, 2016) (citing *Frushour*, 433 F.3d at 400). The Court evaluates each of these three factors below.

### A.  Minimal Standard of Living

The Plaintiff argues strenuously that she simply cannot make ends meet *and* repay her student loan debt. The Plaintiff offered examples of her challenges in paying both her monthly recurring expenses and repaying her student loan debt. Tr. [Adv. 370] 26–27.[10] She also indicated that she has no surplus or extra money at the end of the month after paying her monthly expenses.

The Defendant disputes the Plaintiff's position by suggesting that the Plaintiff could reduce her monthly expenses and repay her student loans. The Plaintiff's monthly expenses include rent at $1,800, a car payment at $370, car insurance at $219, health insurance at approximately $100, utilities at approximately $450, and $300 for food and housekeeping supplies. Sch. J, Case No. 19-21815-MMH, ECF 1; Def. Ex. 6, p. 21. Those rough estimates for basic monthly expenses total approximately $3,200. That amount is less than the Plaintiff's net monthly wages, with the difference depending some on the amount of overtime worked by the Plaintiff.[11]

The Defendant, through its questioning of the Plaintiff on cross-examination, suggested that the Plaintiff could move into a different home or otherwise try to reduce her expenses. The Plaintiff testified that she has tried to reduce her expenses but that she is essentially trapped in her current housing situation by her credit history. The Plaintiff testified that, although her landlord

---

[10] "National Collegiate garnished my wages in 2017 and in 2020. And both times I was unable to pay my rent, my landlord took me to court four different occasions from June to November." *Id*.

[11] At one point during the Trial, the Defendant noted that the Plaintiff is currently earning approximately $2,732 every two weeks. Tr. 18. The Plaintiff did not deny this income and documented it in her exhibits. Pl. Ex. 3 [Pay Stubs]. What is striking to the Court about the Plaintiff's paystubs for this period (i.e., January–April 2021) is that the overwhelming majority of this income is derived from overtime hours—*approximately 104 hours of overtime every two weeks*. If you back out those overtime hours, the Plaintiff's biweekly pay is $1,040. As noted above, this level of overtime also is inconsistent with the Plaintiff's work history, which establishes a general range of 40 to 80 hours of overtime per pay period. That lowers the Plaintiff's biweekly pay by potentially significant amounts, depending on the amount of overtime hours actually worked.

has taken her to rent court when she has gotten behind on rent, the landlord also has worked with her to stay in her residence and make payments when she can. Tr. [Adv. 370] 29; Pl. Ex. 3 [Pay Stubs], p. 51; Pl. Ex. 10 [Direct Deposit Voucher], p. 2. The Plaintiff further testified that with her credit history, a move is very difficult and likely would require her to move back to Baltimore City.[12] As the Plaintiff explained, "[a]nd I'm scared to move in the city, I'm going to be perfectly honest. At my age and I'm alone." Tr. [Adv. 370] 32.

The Plaintiff does own a vehicle and stated that her vehicle is required for her employment. Tr. [Adv. 370] 27–28. The Defendant highlighted that the Plaintiff's monthly payment obligations relating to the vehicle in the amount of $370 will cease in 2023. The Plaintiff did not deny this point. As further discussed in the context of the second *Brunner* factor below, while the Plaintiff's expenses may be reduced by this amount in 2023, her overtime hours may also be reduced or she may no longer be working full-time. The Plaintiff did not state any definitive plans to retire, but she did note that her future income depends in large part on her ability to keep working at current levels and that, when she is no longer working, her monthly income will be reduced to $1,500. Tr. [Adv. 370] 31.

In light of the foregoing, the margin between the Plaintiff's monthly income and monthly expenses is razor-thin. Her monthly expenses are recurring at least for the next two years and are basic necessary expenses. The Court found nothing in the record to suggest that the Plaintiff is wasting her money or buying luxury or extraordinary goods. Food, shelter, and transportation are basic daily needs. *In re Clavell*, 611 B.R. 504, 517 (Bankr. S.D.N.Y. 2020) (providing useful framework to evaluate the minimal standard of living factor). The Court acknowledges the

---

[12] The Plaintiff's testimony, which was not contradicted, included the following statements: "Basically I've been looking for an apartment or a townhouse that's cheaper than this. Everything is much higher, unless you go into the city. And it's really bad in the city. So I prefer to stay in the County that I am. Okay. So that limits my search to the County. And most of the things over here I can't afford." Tr. [Adv. 370] 32.

Defendant's argument that the Plaintiff could move to a smaller apartment and pay a lower rent. The Court accepts the Plaintiff's testimony, however, that she has tried to do so and is limited by her circumstances. This Court is not willing to require a debtor to move into unsafe or substandard living conditions just to repay a student loan debt. *See, e.g., id.* ("[A] debtor is not required under *Brunner* to forego necessary and reasonable expenses, such as healthcare expenses, food, and a modest amount of recreation and entertainment that is incident to modern life.").

On balance and considering the record in this proceeding and the applicable case law, the Court finds that, if the Plaintiff is required to repay *all* of her student loan debt to the Defendant, she cannot maintain a minimal standard of living. *See, e.g., In re Dykstra*, 362 B.R. 221, 224–25 (Bankr. D. Md. 2007) ("In order to determine whether or not the Debtor can maintain a minimal standard of living, the Court must evaluate, at the very least, whether her monthly expenses exceed her income. … This does not mean subsistence at the poverty level but is reviewed on a case-by-case inquiry into the Debtor's situation."); *see also Clavell*, 611 B.R. at 516 ("In addition, a 'minimal standard of living' does not require that the debtor live in poverty.").

### B.  Additional Circumstances Showing State of Affairs Will Persist

The Plaintiff is 68 years old. At the time of the Trial, she appeared healthy and did not identify any particular health issues. The Defendant correctly noted that age alone is not sufficient to show that a debtor's circumstances support discharging her student loan obligations. As one court in this circuit has explained,

> Clearly, neither Dr. Najafian's age alone, nor her present physical difficulties, will suffice to meet this demanding standard. In *In re Spence,* the Fourth Circuit held that a debtor in her late 60's, with diabetes and high blood pressure, was not entitled to a discharge of her student loans. 541 F.3d 538 (4th Cir.2008).

*In re Najafian*, No. 09-18112-BFK, 2012 WL 4793117, at *5–6 (Bankr. E.D. Va. Oct. 9, 2012), *aff'd sub nom. Najafian v. Educ. Credit Mgmt. Corp.*, No. 1:12-CV-01408, 2013 WL 1399340 (E.D. Va. Apr. 5, 2013), *aff'd sub nom. In re Najafian*, 539 F. App'x 287 (4th Cir. 2013).

A debtor's age is, however, a factor to be considered by the Court. Notably, courts analyze several factors to evaluate a debtor's future prospects for repaying student loan debt. As the district court in *Brunner* explained, "Predicting the future, however, is never so easy. Minimum necessary future expenses may be ascertained with some precision from an extrapolation of present needs, but unpredictable changes in circumstances such as illness, marriage, or childbirth may quickly wreak havoc with such a budget. Even more problematic is the calculation of future income." *In re Brunner*, 46 B.R. 752, 754–55 (S.D.N.Y.1985) (cited affirmatively by *Najafian*, 2012 WL 4793117, at *5–6). Courts thus consider, among other things, "'(1) whether or not there are any dependents in the Debtor's care; (2) the Debtor's level of education and the quality of that education; (3) the Debtor's lack of marketable job skills; (4) age or other factors that would prevent retraining or relocation in order to increase her income; (5) lack of assets; (6) underemployment; (7) number of years remaining in the Debtor's work life to allow repayment of the loan; (8) maximum income potential in the Debtor's chosen educational field; and (9) illness or incapacity.'" *Dykstra*, 362 B.R. at 225 (quoting *In re Burton*, 339 B.R. 856, 873 n. 33 (Bankr. E.D. Va. 2006)).

The Plaintiff appears physically able to work and willing to work to pay her expenses. The Court cannot ignore, however, the realities of the Plaintiff's situation. She is 68 years old and is two years away from retirement eligibility. If she is unable to work or otherwise decides to retire, her income will drop dramatically.[13] The Plaintiff also appears to be underemployed but is limited

---

[13] The Court's ruling herein is not based on any potential decision by the Plaintiff to retire at age 70. Rather, as suggested by the amount and duration of student loan debt deemed nondischargeable by this ruling, the Court assumes that the Plaintiff will continue to work in order to maintain a minimal standard of living. The Court's references to the

in opportunities by, among other things, her advanced age and employment in the same position and field for over ten years. Tr. [Adv. 370] 31; Tr. 18. The evidence in the record shows that the only reason the Plaintiff can meet her daily living expenses is her ability to work overtime at her current job. The Plaintiff testified that her overtime hours will decrease after the pandemic recovery because more individuals will be available to provide the services she is currently performing. Tr. [Adv. 370] 31; Tr. 19. The Court also observes that requiring an individual at age 68 to continue to work 80 plus hours *per week* for a significant period of time (or even assuming that she could do so) is unreasonable.[14] The Court is not willing to make that leap.

Thus, looking at the Plaintiff's road ahead, she will be earning wages, but there is no evidence in the record that those amounts will increase or even stay the same. Indeed, the Plaintiff's evidence shows that her earning capacity is limited, her overtime opportunities are likely to decrease, and her income will be reduced dramatically upon retirement (whether forced or voluntary). Although her expenses will decrease by $370 per month upon the completion of her car payments in 2023, the Plaintiff stands to lose that amount in her income tomorrow if her overtime hours decrease by even just 20 hours per month.[15] The Plaintiff's evidence supports her position that her current situation is unlikely to improve or even stay the same for the foreseeable future.

---

Plaintiff's income upon retirement simply reflect the reality that, at some point, this Plaintiff will have significantly reduced income available to meet her basic daily living expenses. In this regard, this proceeding and the facts supporting the Court's ruling are different from those cases in which a court has determined that a debtor's desire to retire does not warrant a discharge of her student loan debt.

[14] For example, assuming no additional interest payments, fees, or charges on the debt owed to the Defendant, the Plaintiff would be required to pay over $800 per month for the next 20 years to repay the debt in full. Neither the Plaintiff's earning potential nor the facts of this case support a finding that such payments are possible without imposing undue hardship.

[15] This assumes an overtime pay rate of approximately $19 per hour. Pl. Ex. 3 [Pay Stubs]. The Court notes that the Defendant's assumptions about the Plaintiff's income were, in some instances, based on 80 plus hours of overtime per pay period, or 160 hours of overtime per month. Thus, a drop of 20 hours in any given month is a likely scenario.

### C.  Good Faith Efforts to Repay the Loan

The Plaintiff has multiple student loans and her repayment efforts (and the collection activities of the lender) vary based on the debt at issue. With respect to the student loan debt that the Plaintiff owes to the Defendant, both parties agreed that she has repaid approximately $3,764.43, with her last payment in 2015.[16] Tr. 5.

The Plaintiff testified that she has tried to repay her student loans. The Plaintiff did make voluntary and involuntary payments to the Defendant and other lenders, and she requested a forbearance on her other student loan debt. Tr. [Adv. 370] 26, 28.[17] The Plaintiff also contacted her student loan lenders prior to her bankruptcy filing in 2019 regarding repayment. Tr. [Adv. 370] 28.[18] According to the Plaintiff, she thought she would be able to repay the loans quickly from her earnings after completing all of her education. Tr. 16. The Court found the Plaintiff sincere in her testimony, and does not have any evidence before it that the Plaintiff has deliberately tried to avoid repaying the loans or is otherwise abusing the bankruptcy process in trying to discharge them.

The Code does not define the term "good faith." Courts evaluating a debtor's good faith efforts to repay student loan debt consider a number of factors, including "the debtor's 'efforts to obtain employment, maximize income, and minimize expenses.'" *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 402 (4th Cir. 2005) (citations omitted). Here, the Plaintiff has been working full-time essentially since graduation, even though not in the position she anticipated would be available to her upon graduation. She has made some payments on the

---

[16] In looking at the Plaintiff's tax returns admitted into evidence, the Court notes a significant decline in annual income between 2015 and subsequent years. Def. Ex. 7. For example, in her tax returns for 2014, the Plaintiff's Gross Income is listed as $74,245. By 2017, the Plaintiff's tax returns show a Gross Income of only $55,190. The Plaintiff's W2 form for 2019 shows gross wages of only $43,209.34. Pl. Ex. 3 [Pay Stubs], p. 21.

[17] "They garnished my wages even though I made certain payments when I could." *Id*.

[18] "Well in 2019 I wrote letters to all the student loan people. And I requested them to let me pay $50 a month to everyone. Nobody responded." *Id*.

Defendant's loans and, for completeness of the record, did not ignore her other student loan obligations.[19] As one court has explained, citing Sixth Circuit precedent,

> "There is no evidence that the [Plaintiff] did not act in good faith. This is not a case where the [Plaintiff] seeks discharge within a month of loans becoming due." *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 360 (6th Cir.1994) ("The Cheesmans made minimal payments on their loans several years after their loans became due and at least a year before filing for bankruptcy. Furthermore, the Cheesmans chose to work in worthwhile, albeit low-paying, professions. There is no indication that they were attempting to abuse the student loan system by having their loans forgiven before embarking on lucrative careers in the private sector.").

*In re Nixon*, 453 B.R. 311, 334 (Bankr. S.D. Ohio 2011).

The Court agrees with the foregoing analysis. The Court recognizes that "[s]eeking out loan consolidation[] options is 'an important component of the good-faith inquiry' because such efforts demonstrate that the debtors take their debts seriously and are doing their utmost to repay them despite their unfortunate circumstances." *In re Augustin*, 588 B.R. 141, 153 (Bankr. D. Md. 2018) (quoting *In re Mosko*, 515 F.3d 319, 326 (4th Cir. 2008) (some quotations and citations omitted). The Court does not, however, find that one factor dispositive. *See, e.g., In re Nightingale*, 543 B.R. 538, 550 (Bankr. M.D.N.C. 2016) ("Although efforts to seek out loan options that make a debt less onerous are important considerations under this prong, no one instance is dispositive. *See In re Frushour,* 433 F.3d at 402.").[20] The Plaintiff made some payments on her student loan debt, did not ignore those debts completely, and appears to have managed her financial

---

[19] Again, the Court's focus in this ruling is the Defendant's debt and the Plaintiff's efforts to repay that debt. With respect to the good faith factor, the Court closely reviewed, among other things, the payments made by the Plaintiff on the Defendant's debt, the timing of those payments and her financial situation at the time those payments ceased, and the Plaintiff's testimony concerning her repayment efforts.

[20] *See also, e.g., In re Clavell*, 611 B.R. 504, 531 (Bankr. S.D.N.Y. 2020) (concluding that debtor met good faith prong of *Brunner* test, even though no payments were made on student loans after consolidation of those loans, where "[t]he evidence shows that Mr. Clavell did his best to maximize his employment opportunities and his income and to minimize his expenses"); *In re Barrett*, 545 B.R. 625, 633 (Bankr. N.D. Cal. 2016) ("While the DOE correctly argues that this court must consider Barrett's failure to apply for one its income-based repayment plans, such inaction is insufficient, standing alone, for this court to find against him on this final *Brunner* factor (particularly where no payment is forecast).").

affairs to the best of her ability. The Court thus finds, based on the entirety of the record, that the Plaintiff, within her limits, made good faith attempts to repay or otherwise address her student loan debt.

The Defendant noted at the Trial that it had made a settlement offer to the Plaintiff, which the Plaintiff rejected. Although the Court appreciates the Defendant sharing this information, the Court does not believe a litigant's refusal to settle should weigh heavily in the Court's dischargeability analysis. The Plaintiff filed this adversary proceeding because she does not believe she has the financial wherewithal to repay the student loan debt. She has the right to have this Court make that determination. This is not a case where the debtor was offered and rejected alternative repayment plans prior to her bankruptcy filing or has evinced a complete disregard for her student loan debt.[21] The Court finds nothing in the record to suggest that the Plaintiff has not made good faith efforts to repay her student loan debt.

### D.  Undue Hardship Analysis and Partial Discharge

The record before the Court supports a finding of undue hardship. More specifically, the Court concludes that requiring the Plaintiff to repay the Defendant *in full* would impose an undue hardship on the Plaintiff. The Court bases this conclusion on, among other factors, the Plaintiff's earning capacity, nominal assets, minimal existing expenses, limited opportunities for decreasing expenses or increasing wages, age, fluctuation in overtime hours and income generally, and past attempts to repay her debt given her limitations.

---

[21] For these and other reasons, the Court finds the facts before it distinguishable from the facts in *Augustin* and *Frushour*. *See, e.g., Frushour*, 433 F.3d at 403; *Augustin*, 588 B.R. at 154. As the Fourth Circuit explained in *Frushour*, "the debtor's hardship must be a result of factors over which she had no control." 433 F.3d at 402. Here, the Plaintiff's age, the employment she has been able to secure, the amount of overtime she is able to work, and her ability to further reduce expenses are largely factors outside of her control. The Plaintiff is not manufacturing undue hardship and her circumstances are not indicative of bad faith.

That said, the Court cannot ignore that the Plaintiff has some ability to repay some portion of her student loan debt. *See, e.g., In re Nitcher*, 606 B.R. 67, 79 (Bankr. D. Or. 2019) (noting that "the fact that [the debtor] cannot afford to repay the Student Loans in full, does not mean that she cannot afford to pay some portion of those loans in smaller periodic payments" and citing Ninth Circuit precedent permitting partial discharge). Courts have recognized the dilemma presented by this scenario: Section 523(a)(8) evinces a Congressional intent to require repayment of student loans when resources are available. The Code does not directly address, however, the scenario when some resources might be available to repay some of the debt but repayment of the entire debt is not possible at all, or at least not without an undue hardship. *See, e.g., Mosko v. Am. Educ. Servs.*, No. 04-52834, 2005 WL 2413582, at *8 (Bankr. M.D.N.C. Sept. 29, 2005) ("Looking to congressional intent (lowering the amount of debtors discharging student loans), the court said that 'to use an all-or-nothing approach has the effect of rendering large debt more likely of discharge, and rewarding irresponsible borrowing, neither of which can be presumed to be part of congressional intent.'") (some quotations and citations omitted).

Although some courts have determined that any ability to repay requires a complete denial of discharge,[22] the Court does not read the Code in that manner. Rather, the Court agrees with those decisions allowing a partial discharge of student loan debt when the debtor has established undue hardship. *See, e.g., In re Alderete*, 412 F.3d 1200, 1206–07 (10th Cir. 2005) (suggesting a partial discharge is permissible when undue hardship exists and explaining that "[w]e agree with our sister circuits that a bankruptcy court cannot exercise its § 105(a) powers to grant a partial discharge of student loans unless § 523(a)(8) has been satisfied"); *In re Clavell*, 611 B.R. 504, 532 (Bankr. S.D.N.Y. 2020) (reducing student loan debt under *Brunner* test to "whatever amount

---

[22] *See, e.g., In re Lozada*, 594 B.R. 212, 229 (Bankr. S.D.N.Y. 2018), *aff'd*, 604 B.R. 427 (S.D.N.Y. 2019) (finding entire student loan debt nondischargeable where evidence suggested the debtor could make some payments under income-based repayment plan but failed to do so).

would require a monthly payment of $250 under a 'standard' 25-year repayment plan"); *In re Dunlap*, No. 15-30795, 2016 WL 93805, at *2 (Bankr. W.D.N.C. Jan. 6, 2016) ("If any one of the [*Brunner* test] requirements is not satisfied, *no part* of the loan can be discharged.") (emphasis added); *Mosko v. Am. Educ. Servs.*, 2005 WL 2413582, at *8 (granting partial discharge).[23] Under this case law and in an effort to effectuate Congressional intent, the Court will grant the Plaintiff a partial discharge of her student loan debt obligations to the Defendant.[24]

To determine the amount of debt not subject to discharge, the Court re-evaluates all of the factors showing undue hardship if the Court required the Plaintiff to repay the student loan debt in full. Those factors include the Plaintiff's current income, as well as potential changes in income and expenses during the next several years. Balancing all of the evidence and considering the language and purpose of the Code, the Court determines that the Plaintiff should be required to

---

[23] *See also, e.g., In re Simms*, 328 B.R. 437, 441 (Bankr. D. Md. 2005) ("Under *In re Cox*, 338 F.3d 1238 (11th Cir. 2003) and *In re Alderete*, 412 F.3d 1200 (10th Cir.2005), a bankruptcy court is unable to use its equitable powers under 11 U.S.C. § 105(a) to grant a partial discharge of a student loan unless the debtor has made a showing of undue hardship under all three prongs of *Brunner. Cox*, 338 F.3d at 1243 ('Because the specific language of § 523(a)(8) does not allow for relief to a debtor who has failed to show "undue hardship," the statute cannot be overruled by the general principles of equity contained in § 105(a).'); *Alderete*, 412 F.3d at 1206–07 ('a bankruptcy court cannot exercise its § 105(a) powers to grant a partial discharge of student loans unless § 523(a)(8) has been satisfied.').").

[24] The Court notes that some judges have highlighted the language "to the extent" in sections 523(a)(2) and (a)(7), which is absent from section 523(a)(8), as a reason to question a partial discharge under section 523(a)(8) of the Code. *See, e.g., In re DeMatteis*, 97 F. App'x 6, 10 (6th Cir. 2004) (approving partial discharge but noting this issue in separate portion of opinion). The language "to the extent" in sections 523(a)(2) and (a)(7) qualifies what might be nondischargeable in the first instance under those subsections. In that respect, it is (this Court respectfully submits) inapposite to the language of section 523(a)(8). Indeed, incorporating "to the extent" into section 523(a)(8) might require a complete reworking of that subsection (e.g., student loan debt is nondischargeable only *to the extent such* debt does not impose an undue burden on the debtor) and, in turn, would likely alter the burden of proof under the subsection. *See, e.g., In re Kish*, 238 B.R. 271, 283 (Bankr. D.N.J. 1999) ("The creditor bears the burden of proving the nondishargeability of a debt under Code section 523(a). *Insurance Co. of North America v. Cohn (In re Cohn),* 54 F.3d 1108, 1114 (3d Cir.1995) ('The burden of proving that a debt is nondischargeable under § 523(a) is upon the creditor, who must establish entitlement to an exception by a preponderance of the evidence.'). *See also In re Bero,* 110 F.3d 462, 465 (7th Cir.1997); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). The Supreme Court of the United States held in *Grogan v. Garner* that the creditor must prove nondischargeability by a preponderance of the evidence. 498 U.S. 279, 287–88, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991)."). Moreover, as noted above, the Court finds undue hardship as to repaying the entire student loan debt in accordance with the express language of section 523(a)(8). The partial discharge granted herein thus furthers the objectives of the Code and is consistent with both the language of sections 105 and 523(a)(8) of Code and applicable case law. *See, e.g.,* 11 U.S.C. §§ 105(a), 523(a)(8); *Law v. Siegel*, 571 U.S. 415, 421 (2014) (explaining that equitable powers of bankruptcy courts under section 105 "must and can only be exercised within the confines of the Bankruptcy Code.").

pay a total of $12,000 (plus interest at the federal judgment rate)[25] to the Defendant on account of the student loan debt.[26] The Plaintiff does not have to pay that amount all at once; rather, the Court finds that the Plaintiff should have an ability to make monthly payments towards that amount over a ten-year period. The Court recognizes that such monthly payments are likely feasible for the Plaintiff now, but may not be so in a few years depending on the Plaintiff's circumstances. As such, the Court expressly notes that the Plaintiff may prepay some or all of the nondischargeable debt she will owe to the Defendant under the terms of this Court's ruling without penalty or additional interest charges.

In sum, the Court holds that $12,000 of the Defendant's debt is nondischargeable under section 523(a)(8) of the Code and that such debt shall accrue interest at the federal judgment rate until paid in full. Repaying that amount plus the remaining balance that would be due on those student loans would impose an undue hardship on the Plaintiff under section 523(a)(8) of the Code and the *Brunner* test.

---

[25] This interest will accrue only until the nondischargeable debt is repaid in full. The Court in the first instance considered not awarding an interest component given the Court's undue hardship analysis. The Court must, however, recognize the potential repayment of the nondischargeable debt in installments. Thus, the Court evaluated the appropriate rate of interest for this particular adversary proceeding (analyzing the different interest rates that might apply to this kind of nondischargeable debt) and determined that the federal judgment rate preserved the Court's calculation of what the Plaintiff could pay on the debt without undue hardship while providing some protection to the Defendant. The Court recognizes that its ruling is not necessarily awarding a monetary judgment as contemplated by 28 U.S.C. § 1961, but references the federal judgment rate solely as a proxy for calculating an appropriate interest rate.

[26] The Court notes that, without overtime hours, the Plaintiff's monthly income is approximately $2,080 and would not provide any disposable income to repay the student loan. Based on the Court's analysis of the facts of this case and its understanding of applicable case law, the Court cannot, however, ignore the Plaintiff's actual earning capacity. That said, if the Plaintiff works 40 hours of overtime per pay period, or 80 hours per month, her monthly income is approximately $3,640 (assuming overtime is paid at $19.50 per hour). After monthly expenses, the Plaintiff would have approximately $440 of surplus per month. The Court's award herein allocates approximately one-fourth of that monthly surplus to the Defendant's debt (if, for example, paid monthly over ten years), which the Court finds appropriate and just given the multiple variables in this case, including how long, and the amount of overtime, the Plaintiff will be able to work in future years.

## V.    <u>Conclusion</u>

The nondischargeability of any debt is a difficult decision in any case. Courts must strive to balance the general rule favoring discharge with the mandates of section 523(a) of the Code. In so doing, the Court must follow Congress' determination that certain debts warrant a limitation on a debtor's financial fresh start. Balancing the important policies reflected in the discharge of section 727(a) and the exception to discharge in section 523(a)(8), the Court determines that a partial discharge of the Plaintiff's student debt is appropriate and warranted in this case. The Plaintiff met her burden to establish that requiring her to repay the full amount of her student loan debt to the Defendant would impose an undue hardship on her in accordance with section 523(a)(8) and the *Brunner* test. Her evidence, however, also shows some ability to repay some portion of that debt. The Court will enter a separate order consistent with this Memorandum Opinion.

cc:    Plaintiff
       Defendant's Counsel

### END OF MEMORANDUM OPINION